UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:20CR508 RWS (SPM) |
| REGINALD AUSTIN, | ) ) ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION AND**
**MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

All pretrial matters in the above-referenced case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Currently before the Court is Defendant Reginald Austin's Motion to Suppress Evidence and Statements (Doc. 50). Mr. Austin is charged in a one count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1). The charge arises from a traffic stop by officers from the St. Louis Metropolitan Police Department on July 28, 2020. Austin contends police used a minor traffic infraction as a pretext to conduct an unconstitutional search and seizure of his car and his person and the firearm and any statements he made should be suppressed because the initial traffic stop, the officers' extension of the traffic stop, and the officers' subsequent search of his person which led to the discovery and seizure of a firearm violated the Fourth Amendment.

**BACKGROUND AND PROCEDURAL HISTORY**

Austin was indicted on September 10, 2020, arrested on September 30, 2020, and appeared before U.S. Magistrate Judge David Noce for an initial appearance and arraignment on the same date. On Austin's behalf, defense counsel repeatedly requested, and I repeatedly granted, time to review discovery, complete an investigation, and file pretrial motions. On March 30, 2021, in compliance with the pretrial motion deadlines imposed by the undersigned, the defense filed a Motion to Suppress Evidence and Statements (Doc. 50). The Government filed its response on April 13, 2021 (Doc. 55). After conferring with the parties

at a scheduling conference, the undersigned scheduled an in-person evidentiary hearing on April 29, 2021. On April 29, 2021, the parties appeared as scheduled for an in-person evidentiary hearing.

At the evidentiary hearing, the United States offered testimony of St. Louis Metropolitan Police Department Officer Eric Lang. The United States also introduced dashcam video footage of the traffic stop and two traffic citations issued to the defendant. Government Exhibits 1-3. The dashcam video, which lacked any audio recording, seemed to be largely consistent with Officer Lang's testimony except for discrepancies more fully described below. Defense counsel offered testimony of Mr. Austin's girlfriend, Ms. Shane Thomas. Attorneys for both parties cross examined the opposing party's witness.

At the close of the evidentiary hearing, the parties requested and were granted time to request a transcript of the hearing and to file post-hearing briefs.  The transcript of the evidentiary hearing was filed on May 10, 2021. (Doc. 60).  Consistent with the scheduling order, Austin was ordered to file his post-hearing brief no later than May 17, 2021. *See* Doc. 63. However, defense counsel requested, and was granted, additional time to file a post-hearing brief. Austin's post-hearing brief was filed on June 1, 2021. (Doc. 64). The United States filed its post-hearing brief on June 10, 2021. Upon review of the evidence of record, including a dashcam video recording of the incident, the undersigned concluded additional evidence was needed to help the Court better evaluate the appropriate weight to assign conflicting testimony presented at the hearing, and scheduled a supplemental hearing after conferring with counsel for both parties.

On July 30, 2021, the parties appeared for a supplemental evidentiary hearing. St. Louis Metropolitan Police Officers Cliff Harper[1] and Matthew Gregston testified on behalf of the United States. Austin did not offer any supplemental evidence, but defense counsel cross examined Officer Gregston at the hearing. At the end of the supplemental hearing counsel requested, and were granted, time to file

---

[1] Officer Harper's testimony was offered solely to establish that the patrol car being used by the officers at the time of Mr. Austin's arrest was equipped with a dashcam video but was not equipped with audio. The undersigned found Officer Harper's testimony to be credible and credits it in its entirety.  The defense declined to cross examine Officer Harper. Although his testimony was helpful in connection with resolving credibility issues, it was not directly relevant to the issues raised in the suppression motion.

additional briefs on the issues. Briefing by both parties was completed on September 2, 2021, and the matter is now fully briefed and ready for a ruling.

The undersigned has carefully considered the evidence that was offered and admitted at the evidentiary hearing, including the credibility of the witnesses at both hearings. The undersigned has also considered the arguments of the parties both at the hearing and in their written submissions. Based upon the evidence adduced at the hearing and the written submissions of the parties, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On July 28, 2020, St. Louis Metropolitan Police Department Officer Eric Lang had been a police officer for approximately two and a half years. At the time, he was assigned to patrol the First District and was one of three officers in a marked patrol car. While patrolling the area, Officer Lang, who was a passenger in the patrol car, observed a yellow Chevrolet Camaro pulling out of a gas station parking lot onto southbound S. Broadway ahead of their patrol car. Officer Lang testified the yellow Camaro drew his attention because he and his fellow officers believed it was the same yellow Camaro they had observed earlier in the day travelling in a reckless manner in the same area.

Officer Lang testified that as the Camaro pulled out of the gas station, he observed it make a wide right turn onto southbound Broadway causing it to cross from lane #2 (the outside or right lane) into lane #1 (the inside or left lane) and back to lane #2. Officer Lang testified that what he observed constitutes an improper right turn-incorrect lane usage violation of City of St. Louis traffic ordinances. After Officer Lang made this observation, Officer Gregston, the driver of the patrol car, maneuvered behind the Camaro and attempted to catch up to it. Officer Lang testified that, once behind the Camaro, he observed the Camaro cross the line from lane #2 into lane #1 before correcting back into lane #2, which, Officer Lane testified, constitutes weaving and improper lane usage in violation of City of St. Louis traffic ordinances.

The dashcam video footage introduced by the United States appears to be generally consistent with the movements described by Officer Lang; but, the lane crossings were so slight and so fleeting they

could easily have been missed by even the most astute observer. However, Officer Lang's explanation that his attention was drawn to the Camaro *before* he observed the improper lane crossings lends credibility to his testimony that he did, in fact, observe these traffic violations even though they were fleeting and subtle.

At approximately 8:18 p.m., Officer Gregston activated the emergency lights and siren of the patrol car and initiated a traffic stop. The driver of the Camaro pulled over almost immediately, and Officer Lang exited the patrol car and approached the Camaro from its rear passenger-side.[2] Officers Lang and Gregston both testified that, as Officer Lang approached the Camaro, they could see the driver making movements—moving up and down in the driver's seat—as if trying to conceal something. The dashcam video does not entirely corroborate the officers' testimony because, from the appearance on the video, the rear window of the Camaro appeared to be so heavily tinted it would have been difficult, if not impossible, for the officers to see into the car. However, Officers Lang and Gregston both credibly testified that the dash camera exaggerated the window's opacity and one's ability to see into the interior of the car was much greater than the dashcam video footage might suggest.

Once he arrived at the passenger side window of the Camaro, Officer Lang stuck his head partially through the window and asked Austin for identification and explained the reason for the stop. At that point, Officer Lang observed what be believed to be the smell of marijuana and noticed the driver appeared to be hunched over concealing something on his lap with his left hand. This caused Officer Lang to suspect the driver was potentially concealing either a weapon or narcotics. Officer Lang returned to the patrol car with Austin's driver's license and gave it to Officer Gregston to run a computer inquiry. Officer Lang told Officer Gregston that he had smelled marijuana coming from the Camaro and returned to the passenger side window of the Camaro where he continued to speak with Mr. Austin.

Officer Lang testified that he asked Austin if he had drugs or weapons in the car and Austin initially denied that he had either. However, Officer Lang testified that after he told Austin that he could

---

[2] The dashcam video reflects that the third patrol officer also exited the patrol car at that time.

smell marijuana, Austin admitted that he had smoked marijuana earlier. After speaking to Mr. Austin for a minute or two, Officer Lang stepped away from the Camaro (approximately five feet) but appeared to maintain visual contact with Mr. Austin.

Officer Gregston's records check appears to have taken no more than six minutes and, once he was finished, Gregston got out of the patrol car and approached the driver's side door of the Camaro. Officer Gregston advised Officer Lang that Austin was a convicted felon and asked Mr. Austin to get out of the car. Officer Gregston testified that he also noticed the smell of marijuana once he reached the driver's side door of Austin's car.

Officer Lang testified that, as Mr. Austin got out of the car, he observed a large bulge in Austin's crotch area that he believed may have been either a weapon or narcotics as its shape was not consistent with human anatomy. It appeared to Officer Lang that Austin may be reaching for the item concealed in his pants (and this is supported by the dashcam video); so, Officer Lang placed Austin in handcuffs for the safety of the officers.

As Officer Lang attempted to handcuff Mr. Austin, it became apparent he was holding a cell phone. At that point, the third officer who was present, Officer Wentzel, seized the cell phone Austin was holding. Officer Lang testified that, unbeknownst to the officers, Mr. Austin had been talking to someone on his cell phone. As Officer Wentzel was removing the cell phone from his hand, Austin spontaneously stated out loud "they're locking me up they found the gun baby."  Officer Lang heard a voice on the other end.

Officer Lang testified that Officer Wentzel felt the outside of Austin's pants and advised the other officers that it felt like a firearm at which point Officer Wentzel retrieved a loaded Taurus PT 111 9mm from Austin's pants. The seizure of the firearm from Austin's pants is also partially captured by the dashcam video. Officer Lang testified that as Officer Wentzel removed the gun Austin spontaneously stated it was his girlfriend's gun that he was an "ex con." By approximately 8:26 p.m., Austin was placed

under arrest for unlawful possession of a firearm and was subsequently issued citations for the traffic violations.

Austin was subsequently advised of his *Miranda* rights. He indicated he understood his rights, waived them, and proceeded to make incriminating statements to police.

The person Mr. Austin was speaking with on the phone during the police encounter was his girlfriend, Ms. Shane Thomas. Ms. Thomas testified that she is a medical assistant who was most recently employed at Mercy Hospital. She and Mr. Austin have been in a relationship for three years and currently live together. Mr. Austin called her after he was pulled over and put her on speakerphone. She testified that she heard an officer inform Mr. Austin that they were conducting "an investigation" but the officer did not say anything about improper lane usage. Ms. Thomas further testified she never heard the officer mention that he smelled marijuana in the Camaro; nor did she ever hear Mr. Austin say that he had smoked marijuana in the car. She heard a commotion after hearing an officer ask Mr. Austin to get out of the car and then the phone "went dead." She denied hearing Mr. Austin spontaneously say anything about them finding the gun. Ms. Thomas testified that when she came to retrieve the car a later, it did not smell like marijuana. She did not specify how much time had passed before she retrieved the car.

Ms. Thomas' testimony that she was on the phone with Mr. Austin throughout his entire encounter with the police until the time Officer Gregston asked him to get out of the car seems consistent with Officer Lang's testimony that, when he first approached Mr. Austin, Austin appeared to be hunched over attempting to conceal something on his lap. Indeed, it is entirely plausible that Mr. Austin was attempting to conceal the fact that he was on the phone (and someone was listening in) when Officer Lang first approached the passenger side window of the Camaro.

However, Ms. Thomas' testimony regarding what she did (and did not) hear during the exchange is not entirely credible based on the evidence. Specifically, it does not appear likely that Ms. Thomas would have been able to hear the entire exchange between Officer Lang and Mr. Austin without any interference based on where Officer Lang was standing, the likely location of the phone, and the ambient

background noise. By her own admission, Ms. Thomas was not present at the time and could not see or understand the logistics reflected on the dashcam video. Her testimony that the phone went dead after Mr. Austin was asked to get out of the car is inconsistent with her own testimony that she heard Austin say things like "why are you pulling me out" and inconsistent with Officer Lang's testimony that he could see that a call was in progress and he heard a voice on the other end. These inconsistencies coupled with Ms. Thomas' longstanding relationship with Mr. Austin and the balance of the evidence presented at both the initial and supplemental hearing diminishes the reliability of her testimony.

## CONCLUSIONS OF LAW

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *Elkins v. United States,* 364 U.S. 206, 223-24 (1960) (evidence obtained as the result of an unreasonable search and seizure by state officers cannot be used against defendant in federal court). The purpose of the exclusionary rule is to deter constitutional violations. *See United States v. Leon,* 468 U.S. 897, 906 (1984). The exclusionary rule applies to verbal statements obtained as a result of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

In this case, Austin appears to argue that the officers violated the Fourth Amendment when they initiated the traffic stop because they lacked probable cause to believe he committed a traffic violation and were instead engaged in a fishing expedition for guns or drugs. Austin also contends officers lacked reasonable suspicion or probable cause to extend the traffic stop beyond the issuance of a citation. Austin further posits the officers' subsequent search of his person which led to the discovery and seizure of a firearm was unreasonable and violated the Fourth Amendment. Finally, Austin moves to suppress any

statements he made as the fruit of an unconstitutional search and seizure. I will address each of these arguments in turn.

### A. THE OFFICERS HAD PROBABLE CAUSE TO INITIATE THE TRAFFIC STOP

There is no dispute that the officers' decision to pull Austin over implicated the Fourth Amendment. It is well established that the "[t]emporary detention of individuals during [a traffic stop] by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Whren v. United States,* 517 U.S. 806, 809-10 (1996)). As such, a traffic stop is "subject to the constitutional imperative that it not be unreasonable under the circumstances." *Whren,* 517 U.S. at 810.

As the foregoing factual findings demonstrate, the officers initiated a traffic stop after Officer Lang observed Austin make a wide right turn onto southbound Broadway and cross briefly from lane #2 (the outside or right lane) into lane #1 (the inside or left lane) and back to lane #2; he then observed Austin cross the line from lane #2 into lane #1 before correcting back into lane #2. Officer Lang testified that what he observed constitutes an improper right turn-incorrect lane usage and weaving in violation of City of St. Louis traffic ordinances. The dashcam video footage introduced by the United States shows the movements described by Officer Lang; but, it also shows that the lane crossings described by Officer Lang were so slight and so fleeting that they could easily have been missed by even the most astute observer.

Austin seems to suggest that the infraction—if one occurred at all—was so slight and so fleeting that a traffic stop based on Officer Lang's observations was unreasonable under the Fourth Amendment. However, the controlling law in this circuit makes clear that the decision to conduct a traffic stop is generally reasonable where the police have probable cause to believe that a traffic violation has occurred. *Gunnell,* 775 F.3d at 1083. Notwithstanding Austin's suggestions to the contrary, it does not appear that the Eighth Circuit Court of Appeals has recognized any sort of unreasonableness carve-out for minor

traffic infractions. Instead, the Eighth Circuit has repeatedly held that "a traffic violation, no matter how minor, creates probable cause" for a traffic stop. *United States v. Ehrmann*, 421 F.3d 774, 780 (8th Cir. 2005). This rule applies to ordinance violations. *See, e.g., United States v. Harris*, 617 F.3d 977, 979 (8th Cir. 2010) (applying rule to excessive license plate tint).

Austin also suggests the initial stop was constitutionally unreasonable because the officers' true motive was to engage in a fishing expedition for drugs or guns. However, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015). And, as the United States has correctly pointed out, the Eighth Circuit has held that in determining whether police have violated the Fourth Amendment in conducting a traffic stop, "[c]ourts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones,* 275 F.3d 673, 680 (8th Cir. 2001) (citing *Whren v. United States,* 517 U.S. 806, 813 (1996) (holding that while it is decidedly constitutionally impermissible for police to decide which motorists to stop based on the race of a car's occupants, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment")). Although Austin's skepticism here is understandable, this Court cannot consider any ulterior motives the officers may have had when they decided to stop Austin for what appears to have been a minor traffic violation.

In sum, based on the record before the Court, including the dashcam video, it appears the officers had probable cause to initiate the traffic stop. As Austin's own briefing acknowledges, St. Louis City Municipal Ord. 57831 § 1 17.16.20 provides "[a] vehicle …shall not weave in and out of lanes of traffic" where "any roadway has been divided into two or more clearly marked lanes for traffic lanes." Although the infraction may have been minor and fleeting, the evidence demonstrated that officers had probable cause to effectuate a traffic stop for violations of the St. Louis City lane usage ordinance when they saw Austin cross into lane #1 from lane #2 and back again on more than one occasion.

**B. The Traffic Stop Was Not Unreasonably Prolonged**

To remain constitutionally reasonable, detention for a traffic violation "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). The Eighth Circuit has repeatedly held:

> [I]f a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. Occupants . . . may be detained while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. These tasks can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. The officer may also ask questions about the occupant's travel itinerary.

*Gunnell,* 775 F.3d at 1083-84 (quoting *United States v. Ovando–Garzo,* 752 F.3d 1161, 1163 (8th Cir. 2014)).

"[O]nce an officer finishes the tasks associated with a traffic stop, the purpose of the traffic stop is complete and further detention . . . would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention." *Gunnell,* 775 F.3d at 1083-84. In *Terry v. Ohio,* 392 U.S. 1, 28-31 (1968), the Supreme Court held that investigatory stops—i.e., brief seizures by police that fall short of traditional arrests—are also reasonable and lawful if justified by a reasonable suspicion that an individual is engaged in criminal activity and if police activities during the investigatory stop are reasonably related to the circumstances that initially justified the stop. *See also Rodriguez v. United States,* 135 S. Ct. 1609, 1615 (2015). Consistent with *Terry*, the Eighth Circuit has repeatedly held that an officer may "expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). *See also United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (officer has justification for intrusion unrelated to the traffic offense if "during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband").

"Whether a detention is reasonable is a fact-intensive question which is measured in objective terms by examining the totality of the circumstances." *Gunnell,* 775 F.3d at 1084. To avoid violating the Fourth Amendment, however, the officer's suspicion must be based upon "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Jones,* 269 F.3d at 927 (quoting *United States v. Beck,* 140 F.3d 1129, 1136)) (8th Cir. 1998)). In determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion—the whole picture, i.e., the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *Jones,* 269 F.3d at 927.

Based on the evidence presented and the foregoing factual findings, after the officers pulled Austin over, it took Officer Gregston approximately six minutes to conduct a records inquiry—a task associated with the traffic stop. As such, at least through the time Officer Gregston completed the records inquiry and got out of the patrol car, the officers did not need reasonable suspicion to continue the detention. *Gunnell*, 775 F.3d at 1083.

However, the evidence of record also established that within minutes of pulling Mr. Austin over, even before Officer Gregston completed his records check, the officers decided they were going to prolong the traffic stop to investigate possible criminal activity beyond the traffic violation. They articulated three primary reasons for doing so: (1) they believed Austin's car was the same car they observed being operated in a reckless manner earlier in the day; (2) as Officer Lang approached from behind the car, they observed Austin making movements suggestive of an attempt to conceal something; (3) Officer Lang smelled marijuana emanating from the car once he reached the passenger side window and Austin appeared to be hunched over as if trying to conceal something on his lap; and (4) Officer Lang conveyed his observation regarding the marijuana to Officer Gregston, and then got Austin to admit that he had smoked marijuana earlier. The evidence also demonstrated that after Officer Gregston completed the records check but before the officers asked Austin to get out of the car, Officer Gregston learned that Austin was a convicted felon

and Gregston also smelled marijuana emanating from the car. Based on the totality of the circumstances articulated by the officers, they had reasonable suspicion (if not probable cause) to prolong or expand the traffic stop.

In *United States v. Mayfield*, 678 Fed.Appx.437, 439 (8th Cir. 2017) the Eighth Circuit held that "the odor of marijuana emanating from a vehicle provides probable cause to search the vehicle pursuant to the automobile exception to the Fourth Amendment's prohibition of warrantless search and seizures." *See also United State v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000); *United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999). For example, in *Neumann*, the officer smelled the odor of marijuana during a traffic stop and the defendant admitted to having smoked marijuana in the vehicle after which the officer conducted a search of the entire vehicle. In upholding the search of the entire vehicle, the Eighth Circuit held "detection of the smell of burnt marijuana while he was conducting a search for an open container gave him probable cause to search the entire vehicle for drugs" *Id*. at 756. Indeed, it is well-established that "[p]olice may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence." *United States v. Payne*, 119 F.3d 637, 642 (8th Cir.1997).

The odor of marijuana, Austin's admission to having used marijuana earlier, and Austin's apparent attempt to conceal something on his lap all furnished reasonable suspicion for a subsequent search of Austin's car for contraband. As such, the officers had reasonable suspicion, if not probable cause, to prolong the traffic stop to search Austin's Camaro for evidence of marijuana possession which, if confirmed, would have been a violation of Missouri law.

C. **NEITHER THE PAT DOWN SEARCH NOR AUSTIN'S WARRANTLESS ARREST VIOLATED THE FOURTH AMENDMENT**

The officers' subsequent pat down search of Austin which led to the discovery and seizure of a firearm and Austin's arrest did not violate the Fourth Amendment because it was supported by reasonable suspicion if not probable cause. In conducting an investigatory *Terry*-type stop, "[o]fficers must 'use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Newell,* 596 F.3d 876, 879 (8th Cir.

2010) (quoting *Terry,* 392 U.S. at 25-31). Where police exceed the permissible scope articulated in *Terry*, the investigatory detention is transformed into an arrest that must be supported by probable cause. *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012). For example, a *Terry* stop may become an arrest, requiring probable cause, "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Newell,* 596 F.3d at 879.

However, officers may, without converting an investigatory *Terry* stop into an arrest, take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *Hensley,* 469 U.S. at 235). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Smith,* 648 F.3d at 654 (quoting *United States v. Fisher,* 364 F.3d 970, 973 (8th Cir. 2004)). *See also United States v. Danielson,* 728 F.2d 1143, 1146-47 (8th Cir.1984) (concluding investigatory detention did not become an arrest when the officers drew their weapons before approaching the vehicle occupied by suspected armed bank robbers).

In addition, "[o]fficers may conduct a protective pat-down search for weapons during a valid stop—whether a traffic stop or an investigative *Terry* stop or a consensual stop—when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" *United States v. Robinson,* 664 F.3d 701, 704 (8th Cir. 2011) (*quoting Davis,* 202 F.3d at 1063). However, under *Terry,* "there must be reasonable suspicion of on-going criminal activity justifying a ***stop*** before a coercive ***frisk*** may be constitutionally employed." *United States v. Jones,* 606 F.3d 964, 967 (8th Cir. 2010) (emphasis in original).

The factual findings demonstrate that before Officer Lang placed Austin in handcuffs and Officer Wentzel conducted a pat down, Officer Lang had noticed the odor of marijuana coming from the car, heard Austin admit that he had smoked marijuana earlier, noticed that Austin appeared to be concealing something on his lap, learned Austin's status as a convicted felon, observed a suspicious bulge in Austin's crotch area

as he exited the car, saw Austin reaching for the item concealed in his pants, and both Officers Lang and Wentzel heard Austin spontaneously say out loud "they're locking me up they found the gun baby."

Officer Wentzel searched Austin for a weapon after hearing Austin's spontaneous statement about the gun and after feeling the outside of Austin's pants and advising the other officers that it felt like a firearm. In sum, based on the totality of the circumstances, the officers acted reasonably for Fourth Amendment purposes when they decided to handcuff Austin once he got out of the car, pat him for weapons, and search his pants for a firearm.

Austin's warrantless arrest was also reasonable under the circumstances. An investigatory stop that becomes an arrest must be supported by probable cause. *Aquino*, 674 F.3d at 924. "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *United States v. Rivera*, 370 F.3d 730, 733 (8th Cir. 2004) (citing *United States v. Wajda,* 810 F.2d 754, 758 (8th Cir. 1987)).

In this case, Austin was placed under arrest after Officer Wentzel discovered and seized the firearm. As set out above, the officers knew (or had reason to suspect) Austin was a convicted felon and was prohibited from carrying a firearm. As such, based on a totality of the circumstances, the officers had probable cause to place Austin under arrest for being a felon in possession of a firearm.

D. AUSTIN'S STATEMENTS WERE NOT THE FRUIT OF AN UNCONSTITUTIONAL SEARCH AND SEIZURE

Austin's motion to suppress statements is rooted in alleged Fourth Amendment violations by the officers. Austin does not contend that his Fifth Amendment rights were violated and, the evidence presented would not support such a contention. Austin's motion to suppress statements he made prior to and after his arrest as the fruit of an unconstitutional search and seizure fails because, for the reasons set out above, the officers' search and seizure of Austin and the firearm did not violate the Fourth Amendment.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 50) be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be conducted before the **Honorable Rodney W. Sippel**. Judge Sippel will schedule the trial by separate order at a later date.

Dated: September 8, 2021.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE